IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,          )
                                   )
              Plaintiff,           )
                                   )
-vs-                               )     No. 20-CR-276-GKF
                                   )
SHANNON JAMES KEPLER,              )
                                   )
              Defendant.           )



TRANSCRIPT OF MOTION HEARING

**BEFORE THE HONORABLE GREGORY K. FRIZZELL**

UNITED STATES DISTRICT JUDGE

APRIL 12, 2021



A P P E A R A N C E S


        **Ross Lenhardt and Sean Taylor,** Assistant U.S.
Attorney, 110 West Seventh Street, Suite 300, Tulsa, Oklahoma,
74119, attorney on behalf of the Plaintiff;

        **Stanley D. Monroe,** Attorney at Law, Stanley D. Monroe
& Associates, 15 West 6th Street, Suite 2112, Tulsa, Oklahoma,
74119, attorney on behalf of the Defendant.


*REPORTED BY:*        *BRIAN P. NEIL, RMR-CRR*
                     *United States Court Reporter*

Monday, April 12, 2021

\* \* \* \* \*

**THE COURT:**  Very well.  All right.  We have a number
of items to deal with, the motion to suppress, the motion to
continue.  So what makes most sense to the parties here to
address first?  And I have no preference.

**MR. LENHARDT:**  I don't think it really matters too
much, Judge.  I can tell you that the government and the
defense have discussed what witnesses, if any, may be necessary
for the suppression motion.  I think at least from our
perspective, that would appear that there are no witnesses that
would need to be necessary, that if Your Honor finds it
acceptable, that we offer into evidence the exhibits that the
government provided to our response, that that will be all the
testimony that's necessary.

If the court feels differently, Detective Kennedy is
outside, he is prepared to testify in this regard.  But at
least when Mr. Monroe and I discussed this matter, we didn't
see the need for any further testimony or evidence.  It just
appears honestly between the two of us that this is a coin flip
where you have to make the decision.  So --

**THE COURT:**  I don't see the need for additional
testimony, particularly if counsel do not.  And since we raised
the motion to suppress first, let's just jump into that.

Does the prosecution wish to offer these documents into

1    evidence?

2              MR. LENHARDT:  I would, Your Honor.  They are

3    Government's Exhibits 1 through 4, and I believe that they

4    would be admitted without any objection from the defense.

5              MR. MONROE:  That's correct, Your Honor.  We did

6    discuss this before we came to court today, and both sides

7    agree that I think you can make a decision just based upon

8    those exhibits.  But if there's any additional questions, we

9    can bring Detective Kennedy in here.

10             THE COURT:  All right.  Government's Exhibits 1

11   through 4 are admitted without objection.

12        I do ask here before we start, it does not appear that

13   Mr. Monroe seeks to suppress the second statement by

14   Mr. Kepler, that "he died"; correct?

15             MR. MONROE:  Correct.

16             THE COURT:  All right.  So we're simply seeking to

17   suppress the statement that he "had a couple of drinks

18   earlier"; correct?

19             MR. MONROE:  That was preceded by a question.

20             THE COURT:  Yes.

21             MR. MONROE:  Yes.  That was preceded by a question.

22   The other comment was preceded by a statement.

23             THE COURT:  And by saying "the other comment" --

24             MR. MONROE:  That "he died" --

25             THE COURT:  Yes.

1    **MR. MONROE:**  -- I think was actually a question

2    rather than a statement, but I think the testimony would show

3    that Detective Kennedy informed Mr. Kepler that Mr. Lake had

4    died.

5    **THE COURT:**  Correct.  There was no inquiry there.

6    It was simply a response to his statement.

7    **MR. MONROE:**  Yeah, right.

8    **THE COURT:**  Yeah, I follow.

9    **MR. MONROE:**  The other question, though, "have you

10   had any anything to drink," was a question which was asked

11   after Mr. Kepler had invoked his right to counsel, very clearly

12   invoked his right to counsel.

13   **THE COURT:**  All right.  And as I understand it, the

14   government concedes that Mr. Kepler had invoked his *Miranda*

15   rights prior to that statement; correct?

16   **MR. LENHARDT:**  Yes, sir.

17   **THE COURT:**  All right.  And the court is prepared to

18   rule.  Are there any other arguments to be made here?

19   **MR. LENHARDT:**  Just a very brief one from the

20   government, Judge.

21   Almost every time I come to federal court --

22   **THE COURT:**  Oh, I'm sorry.  Would you mind coming up

23   to the podium?  And you don't need the mask there.

24   **MR. LENHARDT:**  I've already had my distemper shots,

25   like most people here, so I think I ought to be good to go.

1    **THE COURT:**   And I know Mr. Monroe did because I was

2    there when he had his shot.   So --

3         **MR. LENHARDT:**   My very brief argument is this.

4         Almost every time that I go into federal court a judge

5    asks a defendant, "Have you had any drugs or alcohol in the

6    last 48 hours?"   The reason that you ask him those questions is

7    to determine whether he is competent to answer any further

8    questions that you might have of him.   When you do that,

9    generally the defendant is in custody.   So the question becomes

10   should you give the defendant *Miranda* rights every time?   And

11   the answer is clearly, no, that you don't need to do that.

12   Because your inquiry is not for the purpose of determining if

13   he did something illegal, it is for the same purpose that

14   Detective Kennedy was essentially asking.   This was not a

15   question designed or intended to be incriminatory.

16        **THE COURT:**   But the purposes are entirely different,

17   aren't they?   For my purposes, I'm trying to find out whether

18   they're competent to proceed at that hearing.   Isn't it

19   reasonably characterized in the context in which officer -- or

20   Mr. Kepler was involved, wasn't it reasonably likely to elicit

21   an incriminating response?

22        In my questioning of criminal defendants, I'm not going

23   to have them charged if they've consumed alcoholic beverages.

24   I'm simply going to continue the hearing.

25        **MR. LENHARDT:**   The question isn't the ultimate use

1   of what the defendant says.  The question is, what the

2   intention was for asking the question.  When you ask it, the

3   defendant might say, "no, I haven't had anything to drink."  It

4   may turn out later that the defendant did have something to

5   drink and he could be charged potentially by some other federal

6   agency with lying to the court, perjury, or 1001 for lying to

7   federal officers.  So the question isn't whether the

8   defendant's statement ultimately may have been inculpatory.

9   I'll give you an example.

10      If I was to ask a defendant when he's arrested, "what's

11  your name, what's your date of birth, where do you live," when

12  you ask those, the questions aren't intended to show something

13  incriminatory.  They're intended to find out background

14  information that's generally required and necessary in almost

15  every case.  The fact that police later go to that same house

16  and find a dead body in the house may mean that the statement

17  is now inculpatory, but the question isn't whether it

18  ultimately is used in the prosecution.  The question is whether

19  at the time that it was asked if it was intended for that

20  purpose.

21      If Detective Kennedy intended to ask questions about

22  the defendant's performance that particular night, the last

23  question that he would really need to know is, did you have any

24  alcohol?  The first thing he would want to know is, did you

25  kill Jeremey Lake; and the second would be, where did you put

1    the gun; and the third is, where is your vehicle that you used

2    during the course of that incident?

3         You saw the video.  You've seen the reports.  They

4    don't ask any of those questions.  None of these questions were

5    intended to be incriminatory.  He had to find out if the

6    defendant was competent to give a statement, or in the

7    alternative, whether he was competent to say, I don't want to

8    give a statement.

9              THE COURT:  But am I inquiring here under the Tenth

10   Circuit standard, which is an objective one, into the

11   lieutenant's subjective intent in asking of the question?

12   Isn't the inquiry objective as to whether it's reasonably

13   likely to elicit an incriminating response?  And then secondly,

14   it goes into because of the response here, we don't know

15   whether the alcohol was consumed before the shooting or after.

16   I mean, it's reasonably likely that it was consumed afterwards

17   as Mr. Kepler was speaking with his lawyer and speaking with

18   his wife.

19        Are you suggesting that the consumption of alcohol

20   afterward is somehow incriminating of Mr. Kepler because he

21   needed it to calm his nerves?  Wouldn't someone naturally take

22   a shot of whiskey or whatever regardless of whether or not he

23   perceived himself to be guilty?

24             MR. LENHARDT:  So those are all very good questions

25   and I think I can answer all of them for you.

1    So the statement itself doesn't tell us exactly when he

2    had that alcohol.  So it would be important, if you're a

3    federal prosecutor or a federal agent, to see if you can find

4    that out.  We did.  We dug into that information.  We know that

5    his mother-in-law had contact with him after he worked that

6    particular day, for example.

7          **THE COURT:**  That lived next door?

8          **MR. LENHARDT:**  Yes.  She lived right next door,

9    correct.

10    And so we interviewed her and she told us essentially

11    that Mr. Kepler was helping her out that particular day after

12    work and that he did not exhibit any signs of having consumed

13    any alcohol, that he didn't smell like alcohol, that he didn't

14    look to be intoxicated, and we know that the shooting was after

15    the contact with the mother-in-law.  And so you have to try to

16    figure out, like you said, is it that he was just calming his

17    nerves afterwards?  That would be a rational thing to do, as

18    you said.

19    So do we know if he had any alcohol before the

20    shooting?  And the answer is that, yes, the government does

21    know and we have evidence of that.  In part, the evidence comes

22    from his own wife and will come from his own attorney at the

23    time as well.  Both of them were interviewed and both of them

24    gave, to some extent, some information in that regard.

25    Essentially they would say that he wasn't drinking when he was

1  with them and that he met them at the Motel 6 near his house in

2  Broken Arrow essentially immediately after the shooting.  We

3  also know from the vehicle when the vehicle was seized that

4  there was no, for example, empty bottles of liquor or anything

5  like that in the vehicle itself.

6       So all the evidence that the government has is that

7  Mr. Kepler went to work that day, that there were things that

8  he saw and did during the course of his employment that led him

9  to conclude that Jeremey Lake could be found at 202 North

10  Maybelle, that after he helped his mother-in-law, he then went

11  to the address, 202 North Maybelle, shot and killed Jeremey

12  Lake and shot at his own daughter.  And we know from the other

13  witnesses that his drinking had to occur during the time frame

14  of the shooting.  There's no evidence that he had anything to

15  drink afterwards --

16       **THE COURT:**  What does that mean, "during the time

17  frame of the shooting"?

18       **MR. LENHARDT:**  Well, there's no way for me to know

19  without interviewing the defendant particularly if, for

20  example, he was sitting at the scene drinking while he was

21  sitting there waiting to see Jeremey Lake, if he had it before

22  he got there, or if he had it on the route between the shooting

23  and where he ultimately met his wife and his attorney.  All we

24  know is this particular piece of evidence, that in the vehicle

25  there was no evidence to show that he was drinking at that

1   point so there's no bottle of alcohol in the car, for example.

2   And so all the evidence that we have indicates that his

3   particular activities that day progressed thusly:  That he went

4   to work, that he used information to try to figure out where

5   Jeremey Lake was, that he went and helped his mother-in-law

6   out, that after that he had something to drink, then he went to

7   the scene of this incident, and from there progressed to Broken

8   Arrow outside the Motel 6.

9   THE COURT:  Well, like a good prosecutor, you're

10  focusing on the facts.  But, again, isn't my inquiry an

11  objective one regardless of the inquiring officer's intent?

12  Don't I have to determine whether or not it was reasonably

13  likely to elicit an incriminating response, particularly in

14  light of what you just told me?

15  MR. LENHARDT:  Yes.  So I believe that you have the

16  Tenth Circuit law accurate in what you have to try to make a

17  determination of.  I submit to you that there's no evidence

18  that the question objectively was intended to elicit any

19  incriminating information.  He was trying to do the same thing

20  that you were doing:  Is this guy competent to do what I'm

21  about to ask him to do?  In your case, it's, for example, plead

22  guilty, or go to sentencing.  In Detective Kennedy's case, it

23  was is he competent to waive or invoke his *Miranda* rights?  And

24  ultimately, we know that that information is going to be

25  necessary when he's taken to jail as well.  So this is

1    information that is gathered by Detective Kennedy every time he

2    interviews someone -- you can see that from the reports -- and

3    there's nothing in any of the other questions that he asks that

4    indicate it's to the contrary.

5            **THE COURT:**   Thank you.

6            **MR. LENHARDT:**   You're welcome.

7            **MR. MONROE:**   Your Honor, I appreciate Mr. Lenhardt's

8    advocacy but I think he's overlooking a glaring point that you

9    raised.  He's assumed a series of events that occurred but he

10   doesn't have any information to fill in some of the time gaps.

11           Yes, we have Mr. Kepler at work, having him coming home

12   from work, helping his mother-in-law move some furniture from

13   down the street to his house, he returned to his home, and then

14   sometime later -- an hour, two hours maybe -- he goes to the

15   scene, 202 North Maybelle, the incident occurs, he leaves

16   there, calls his wife who meets him, and an attorney's called.

17   But he was alone in the vehicle after the incident that

18   occurred around 9:15, 9:17, something like that, until his wife

19   met him in Broken Arrow in the parking lot.

20           **THE COURT:**   When did he get off work?

21           **MR. MONROE:**   He got off work at 5:00, I believe.  Is

22   that correct, 5:00?  5:00.

23           Now, the reason -- the potential answer to the

24   question, it's more than Detective Kennedy just trying to

25   verify whether he could appropriately invoke his rights.  He'd

1  already done that.  You have Mr. Talley -- Officer Talley's

2  report who encountered Mr. O'Carroll, the attorney, and

3  Mr. Kepler in the parking lot of the police courts building

4  before they went inside, and Mr. O'Carroll clearly told Officer

5  Tally that Mr. Kepler was invoking his right to counsel and

6  Mr. Kepler himself invoked his right to counsel when he saw

7  Detective Kennedy.  So there's really no reason why Kennedy

8  would be asking him anything.  He knew his name.  They worked

9  together.  They knew one another.

10       And the reason the testimony's potentially critical is

11  because one of the witnesses, Michael Hamilton, claimed in his

12  interview that had occurred before Mr. Kepler's interview that

13  it appeared to him that the man in the Suburban appeared to be

14  under the influence.  He described him as stumbling, possibly

15  drunk.

16       So that, coupled with the fact that potentially an

17  admission to driving under the influence, which I understand we

18  don't have here, but there's a myriad of ways that that

19  question was specifically designed to elicit something

20  incriminating.

21            THE COURT:  Are you saying that definitively the

22  police had the statement of Hamilton prior to asking the

23  question of Kepler?

24            MR. MONROE:  That's my belief.  I don't have

25  Hamilton's statement right at my fingertips right now.  But my

1    recollection is, that he was interviewed briefly at the scene,

2    more detailed in the detective division, ironically where the

3    trash-can gun was found, and then Kepler and his attorney

4    turned -- or turned Mr. Kepler in shortly before midnight.  So

5    there was about a two-and-a-half-hour gap between the time of

6    the incident and the time that Mr. Kepler appeared in the

7    police parking garage there.

8            So the right to counsel was invoked, *Miranda* was

9    invoked, with Officer Talley.  That information was

10   disseminated to Detective Kennedy.  There was no reason

11   whatsoever for Detective Kennedy to ask any questions, you

12   know, just none, no reason.  And because Mr. Kepler had invoked

13   that right --

14           **THE COURT:**  But under an objective analysis, I don't

15   have to inquire as to what his subjective reason was.

16           **MR. MONROE:**  No, you do not.  I don't think you do,

17   sir.  I think he knew that he had invoked his right to counsel,

18   no questions.  He shouldn't ask another question.

19           **THE COURT:**  Well, I mean, he is entitled -- as the

20   briefing points out, he is entitled to ask routine booking

21   questions; correct?

22           **MR. MONROE:**  Routine booking questions, yes, sir.

23   Yes, sir.

24           Now, you know, to the extent that David Moss jail would

25   have a policy of making those inquiries with respect to inmates

1  coming into the jail, that's another matter.  We're just

2  talking about the question by Detective Kennedy and the answer

3  by Mr. Kepler.

4           **THE COURT:**  Thank you.

5           **MR. MONROE:**  Thank you.

6           *(Discussion held off the record)*

7           **THE COURT:**  All right.  The court is prepared to

8  rule.  We will enter a written order on this later.

9           The Tenth Circuit has held that the inquiry as to

10  whether or not an officer's question or comment was "reasonably

11  likely to elicit an incriminating response" is an objective one

12  and the court must focus on the perceptions of a reasonable

13  person in the suspect's position rather than the intent of the

14  investigating officer.  And that's found in *United States v.*

15  *Cash*, 733 F.3d 1264, at 1277, quoting *United States v. Rambo*,

16  365 F.3d 906, at 909 (10th Cir. 2004).

17           The U.S. Supreme Court has recognized that a -- or

18  recognized a routine booking question exception which exempts

19  from *Miranda*'s coverage questions to secure the biographical

20  data necessary to complete booking or pretrial services.

21  However, the plurality recognized that the police may not ask

22  questions even during booking that are designed to elicit

23  incriminatory admissions.

24           The detective's inquiry as to whether Mr. Kepler had

25  anything to drink does not fall within the routine booking

1    question exception to the *Miranda* requirement.   The question

2    was not directed to general biographical data necessary to

3    complete the booking process.

4         The government points out that the form which Detective

5    Kennedy relied upon asks whether the inmate appears to be under

6    the influence of drugs or alcohol.   Significantly, however,

7    that inquiry appears under the heading "observations" rather

8    than "questions."   This suggests that the officer need not ask

9    the suspect but may complete the form based on his or her own

10   observations.

11        And I will say that Officer Kepler was acting a bit

12   strange during that interview but that's not part of the

13   inquiry here.

14        The government directs the court to the Ninth Circuit's

15   decision in *United States v. Washington,* 462 F.3d 1124 (9th

16   Cir. 2006).   In that case, the court concluded that questioning

17   regarding an individual's gang moniker was a routine booking

18   question because it went to the person's identity.   The court

19   reasoned that asking about a nickname, even if it's for

20   identification purposes, is no different from simply asking for

21   a suspect's name.   But here, Detective Kennedy's question was

22   clearly unrelated to Mr. Kepler's identity.

23        The court concludes that a reasonable person in the

24   suspect's position, rather than focusing on the intent of the

25   investigating officer, under that standard, the court concludes

1    that the officer's question was reasonably likely to elicit an

2    incriminatory response and the motion to suppress is granted.

3            All right.  Let's move to the motion to continue.  I

4    don't know that a written response is necessary.  Mr. Lenhardt.

5            MR. LENHARDT:  Sorry.  I keep going to the wrong

6    place.

7            THE COURT:  Yeah.

8            MR. LENHARDT:  I agree that I don't think a written

9    response is necessary and I don't even think much of an oral

10   argument is necessary here.

11           It appears that the continuance is basically based upon

12   the defense's concern that other cases may, in fact -- may

13   impact this particular case.  That appears to be something that

14   Your Honor can take care of during the voir dire of different

15   potential jurors in this particular matter so I don't see that

16   a continuance is necessary.  That's the short answer.

17           THE COURT:  All right.  Anything to add to the brief

18   that was filed?

19           MR. MONROE:  No, sir.  Well, just a response to

20   Mr. Lenhardt's comments.

21           We also pointed out that Mr. Kepler's matter has had a

22   significant amount of pretrial publicity throughout the state

23   court proceedings and even up to the current time.  But that,

24   again, is an issue that the court could take care of either

25   with a jury questionnaire or voir dire.  But it's the extensive

1    media coverage of the matter in Minneapolis.  George Floyd

2    died.  Officer Chauvin was standing trial.  That trial is being

3    televised.  Potentially some of the jurors may be watching that

4    and the thought of -- you know, there's talking heads on all

5    the time talking about racism and black -- or white officers'

6    inappropriate use of force against black citizens, and even

7    though that really may not be a part of this trial.  But

8    nevertheless, a police officer accused of killing a citizen.

9    It just seems like there's just an awful lot in the media that

10   might be consuming the attention of some of the jurors.  And so

11   to avoid that prejudice, we'd ask the court to consider

12   continuing this case about 60 days.

13        And we also pointed out there's a -- the COVID issue is

14   still a bit of a concern, certainly not as much as it was six

15   months ago.  But a number of citizens have yet to be

16   vaccinated, and I always wonder whether or not jurors may feel

17   a little uncomfortable being in a situation in a courtroom next

18   to others.  So that's another consideration as well.  Thank

19   you.

20        **THE COURT:**  Thank you.  Section 3161(h)(7)(A) of the

21   Speedy Trial Act permits a federal district court to exclude

22   any period of delay resulting from a continuance if the judge

23   granted such continuance on the basis of his findings that the

24   ends of justice served by taking such action outweigh the best

25   interest of the public and the defendant in a speedy trial.

1    Pursuant to the Speedy Trial Act, the court shall

2    consider whether the failure to grant such a continuance in the

3    proceeding would be likely to make a continuation of such

4    proceeding impossible or result in a miscarriage of justice.

5    Mr. Monroe argues that in light of the media exposure

6    associated with Mr. Kepler's case, not to mention the likely

7    spillover from the trial in Minnesota, the prejudice may be too

8    much to overcome at this time.  Mr. Monroe does not direct the

9    court to any evidence of actual prejudice, but rather he

10   implicitly asks the court to presume that Mr. Kepler will be

11   prejudiced by an April trial.

12   For the court to presume that inflammatory pretrial

13   publicity so permeated the community as to render impossible

14   the seating of an impartial jury, the court must find that the

15   publicity, in essence, displaced the judicial process thereby

16   denying the defendant his constitutional right to a fair trial.

17   And that's from *United States v. McVay*, 153 F.3d 1166, at page

18   1181 (10th Cir. 1998).

19   From that same case, the court stated that the bar

20   facing the defendant wishing to prove presumed prejudice from

21   pretrial publicity is extremely high.  And that's at page 1182.

22   The defendant must establish that an irrepressibly

23   hostile attitude pervaded the communities.  That's from

24   *Stafford v. Saffle*, S-a-f-f-l-e, 34 F.3d 1557, at 1566 (10th

25   Cir. 1994).  The law does not require that jurors be ignorant

1   of the controversy, only that they be impartial.  That's also

2   from *Stafford* at page 1566.

3          In support of the motion, Mr. Monroe provides the court

4   a four-page list of headlines related to Mr. Kepler's case.

5   Mr. Monroe does not provide the court the content of those

6   articles.  Based on the headlines and source citations alone,

7   it appears that the majority of the articles are factual

8   reports rather than editorials.  Based on the evidence

9   presented, there is no suggestion of a circus atmosphere or

10  lynch mob mentality or of any other community-wide rush to

11  judgment that infected other trials that have been set aside

12  For lack of an impartial jury.  Again, from *Stafford* at page

13  1566.

14         To the extent that Mr. Kepler relies on the ongoing

15  Chauvin trial, he offers no evidence in that regard.  Although

16  the case has received nationwide attention, Mr. Kepler fails to

17  show that it has resulted in an irrepressibly hostile attitude

18  that pervades the community.  This is particularly true in

19  light of the factual differences between the Chauvin case and

20  this case.  Mr. Chauvin was on duty at the time of George

21  Floyd's death and was on the scene in his capacity as a police

22  officer.  In contrast, Mr. Kepler was off-duty at the time of

23  the shooting and acting in his personal capacity.  The court

24  acknowledges Mr. Kepler's prior employment as a police officer,

25  but the defendant has failed to show how the trial of another

1   former police officer in another state related to different

2   factual circumstances will result in the displacement of the

3   judicial process.

4          Further, to ensure the seating of an impartial jury,

5   the court intends to conduct a thorough voir dire.  In

6   addition, the court will entertain arguments with regard to

7   juror questionnaires and allowing counsel to inquire in voir

8   dire.

9          In addition to media coverage, Mr. Monroe argues that a

10  sharp increase of reported positive COVID tests in several

11  states warrants a continuance; however, Mr. Monroe has not

12  shown that Oklahoma is experiencing a surge.  Further, the

13  court notes that Oklahoma's COVID cases have decreased

14  significantly over the past few months while the percentage of

15  the population that has been vaccinated continues to climb.

16  For this reason, pursuant to General Order 21-10, this court

17  has made the decision that it will conduct criminal jury trials

18  in April of 2021.

19         Finally, the court notes that the Speedy Trial Act was

20  intended not only to protect the interests of defendants, but

21  was also designed with the public interest firmly in mind.

22  That's from *United States v. Toombs*, 574 F.3d 1262, at page

23  1273 (10th Cir. 2009).

24         The public has a strong interest in resolution of

25  Mr. Kepler's case.  Mr. Kepler has been tried four times in

1    state court.  The court will not delay providing the parties,

2    their families, and the public some measure of finality by

3    delaying this fifth trial.  For these reasons, Defendant

4    Kepler's motion for a continuance of trial at docket No. 81

5    will be denied.

6         Now, we have a number of other issues here.

7    Mr. Lenhardt, what else does the government believe we should

8    address at today's pretrial?

9         **MR. LENHARDT:**  I just had a couple of generic

10   questions about the trial itself, Judge.

11        **THE COURT:**  Yes, sir.

12        **MR. LENHARDT:**  We know that we were fifth up and now

13   we're first up, and so I just wanted to make sure that what I

14   heard from other prosecutors was going to be the case here,

15   like I heard it was going to if they had been first or second

16   or third.

17        It was my understanding that the court had considered

18   for the first day of the trial, on April 19th itself, ordering

19   that the jury would be selected and assuming that time would be

20   still available for the court to give your preliminary

21   instructions to the jury and for the counsel to open to the

22   jury.

23        It was also my understanding that witnesses were

24   scheduled to start the next morning, and I hope you might be

25   able to consider that here.  It makes my life a lot easier if I

1    know the choreography of when we're going to start with

2    witnesses and it helps with all the other witnesses that sort

3    of follow that.

4            THE COURT:  That would be my intention.  And as you

5    know, this court will be utilized by Judge Eagan -- or this

6    courtroom.  We will try this case in the Boulder courthouse,

7    third floor.  It's my hope that because that courtroom is so

8    large, we'll be able to provide adequate spacing for the jurors

9    in the jury box, we'll probably put out seats in front of the

10   box there to further space out jurors, and we'll be able to, I

11   believe -- or at least I'm told -- bring in all of the

12   prospective panel in that large courtroom and we'll have seats

13   numbered for them with adequate spacing in the gallery.

14           MR. LENHARDT:  So I did go to visit the Boulder

15   courthouse.  The first thing you have to say is, wow, is it

16   beautiful.  The building is beautiful inside.  The courtroom is

17   staggering.

18       Is it the court's intention to have the jurors

19   essentially in the jury box or are they going to be in sort of

20   the gallery as well?

21           THE COURT:  Well, the actual jurors --

22           MR. LENHARDT:  Yes.

23           THE COURT:   -- once we select them?

24           MR. LENHARDT:  Yes, once selected.

25           THE COURT:  It's my intention to spread them out in

1   the box and then have a line of jurors in seats in front as

2   well, and I think we can get that many jurors in.  It would be

3   my intention to seat 14.  I take it this is going to last the

4   week; correct?

5           **MR. LENHARDT:**  Yes, sir.  The government's estimate,

6   from the time we begin to select the jury until they go out for

7   deliberations, is five trial days for that time frame, Judge.

8           **THE COURT:**  All right.

9           **MR. LENHARDT:**  So that sort of brings up a couple of

10  my other sort of random questions.

11          Having visited that courtroom -- it's cavernous is

12  perhaps a good way to put it -- it makes it a bit more

13  difficult to make sure that all of the jurors hear what the

14  witnesses have to say.  So my hope is that you might find it

15  acceptable for me to have a podium sort of at the end of the

16  jury box so that when I ask questions I know that if I can hear

17  the witness, that all the jurors can hear them as well.

18          Is that acceptable to the court as well, Your Honor?

19          **THE COURT:**  I haven't really thought about that.  Of

20  course, the problem with that is it becomes a tennis match,

21  right?  Because you would be at the far end near the gallery

22  and they would be swinging back from you to the other side of

23  the courtroom where the witness stand is.  I don't know that

24  that's necessary.

25          My recollection is that with all of the electronic

1   gadgetry that we now have in the courtrooms, the tether for

2   that podium is probably not long enough to go that far.

3              MR. LENHARDT:  I agree, Your Honor.  But what I

4   found was that there are microphones on the prosecution table

5   that will reach to that area, if that other podium that's sort

6   of hidden in the back part of the courtroom there is just moved

7   out there.

8              So the other reason for my request to have the podium

9   in that particular location of when the counsel asks their

10  questions is sort of this one, Judge, and I'm going to move to

11  help you see what I'm talking about.

12             If I move to this podium instead, if there was a

13  witness on the jury's -- in the witness box at this particular

14  time, as they're speaking to me the person right behind me is

15  the defendant.  We know that some of the people who are going

16  to be witnesses in this particular case were eyewitnesses to

17  the death of their brother and also the defendant's daughter.

18             My experience in 32 years of prosecuting people is that

19  it is very difficult for them to pay attention when they have

20  to see the defendant directly behind me when I ask every

21  question.  They get very distracted.  They often look at

22  defendants behind me.  So I would prefer that they not have to

23  stare through me to the defendant during some of my questions.

24  Obviously, that doesn't apply to the gross majority of my

25  witnesses.  But if I'm able to move the podium, that will help

1   essential with both issues, making sure that the jurors can

2   hear us and making sure that the witnesses aren't distracted by

3   the defendant being directly behind me.

4        THE COURT:  Well, you appeal to my sensibilities as

5   a former state judge, where my only rule was that you couldn't

6   stand on counsel table and ask questions.  I kind of enjoyed

7   the Clarence Darrow moving about the courtroom business, but

8   back then lawyers could project better than they can these

9   days.  Today we need amplification and, of course, your voices

10  have to be preserved for eternity on this high-priced recording

11  equipment purchased for us by the American taxpayers.

12       But let me first ask my courtroom deputy, give me a

13  second and I'll find out the logistics here, and then I'll ask

14  Mr. Monroe as to his view here.

15            *(Discussion held off the record)*

16       THE COURT:  Mr. Monroe, you're familiar with the

17  layout in that cavernous courtroom.  What are your thoughts

18  here?

19       MR. MONROE:  To be honest, Your Honor, I don't

20  believe I've appeared -- I've been in that courtroom since

21  Judge Ellison was with us.  That was his courtroom.  I've been

22  in the second floor courtroom a number of times.  But I just --

23  I was just trying to think in my mind how it's configured.

24       THE COURT:  Well, we changed the configuration.  You

25  were at the last Inns of Court meeting that we had -- it's been

1    years ago --

2                    MR. MONROE:   Right.

3                    THE COURT:   -- when Judge West spoke.  It was kind

4    of a session honoring Judge Ellison.

5                    MR. MONROE:   That's right, I was there.  I'd

6    forgotten about that.  It was pretty packed, as I remember, and

7    I still can't -- I still can't get an image in my mind where

8    the podium was.

9                    THE COURT:   Right.  Well, the podium -- I don't

10   think the location of the podium has changed much.  It's

11   directly --

12                   MR. MONROE:   Okay.

13                   THE COURT:   -- in front of the bench.

14                   MR. MONROE:   All right.

15                   THE COURT:   We've moved the jury box to the west

16   side of the courtroom.  It's expanded.

17                   MR. MONROE:   Okay.

18                   THE COURT:   Much bigger than it was before.  We've

19   expanded the area for the courtroom deputy and the court

20   reporter.  The witness stand is on the west side now close to

21   the jury box.

22        In my mind's eye -- I may have to go over and take a

23   look -- I think we can satisfy Mr. Lenhardt's concern somewhat

24   because I believe that the tether on that podium is such that

25   the podium can be moved closer to the jury box so that the

1    witnesses don't have to view the defendant directly in that
2    line of sight.
3                MR. MONROE:  Okay.
4                THE COURT:  I'm going to have to go over and take a
5    look.  I think that with the restrictions that have been placed
6    on us by these electronic tethers, I think I'm going to have to
7    have you at the podium -- or have both of you at that podium.
8    Because I also believe, after having spoken with Karen, the
9    layout we anticipate for the jurors is going to require that a
10   couple of jurors be seated in chairs in front of the gallery if
11   we have 14 there.
12               MR. MONROE:  Okay.
13               THE COURT:  Which would be approximately the place
14   where Mr. Lenhardt would like to have the podium.
15               MR. MONROE:  Right.
16               THE COURT:  So I think I'm going to -- I'll take a
17   look.  I'd like to honor your request but I think I'm going to
18   need to tether you all to that podium.
19               MR. MONROE:  Well, maybe there might be an
20   opportunity sometime in the next few days for Mr. Lenhardt and
21   I to go over and examine the area and see if we can familiarize
22   ourselves.
23               THE COURT:  All right.  Karen will do that with you.
24               MR. MONROE:  That's good.
25               THE COURT:  Okay.

1              MR. MONROE:   Now, on a slightly different subject,

2    you did mention the possibility of jury questionnaires.   I

3    submitted a proposed questionnaire and would -- if the court's

4    contemplating a questionnaire, I'd be pleased to meet with the

5    government to get some of their input because it's my view that

6    the questionnaire might help both sides in this case.

7              THE COURT:   Well, I was uncomfortable, frankly, with

8    some of the questions that you asked.

9              MR. MONROE:   Sure, yeah.

10             THE COURT:   So I would ask that you sit down with

11   Mr. Lenhardt to see if you can come up with a mutually

12   agreeable questionnaire.   In the alternative --

13             MR. MONROE:   Okay.

14             THE COURT:   -- I would give you a limited time

15   within which to ask questions during voir dire.   I typically

16   don't allow lawyers to do that.

17             MR. MONROE:   Yes, sir.

18             THE COURT:   But given this case, I think it might be

19   warranted.   You've tried enough cases in front of me, typically

20   I will ask questions that you all have submitted.   In addition

21   to those that are set out in the judge's bench book, I'll set

22   out -- or I will ask the questions that I believe are relevant

23   that you've set out in requested voir dire and then I'll call

24   you up and ask if I've missed anything essential.   But I'll

25   consider giving you both an opportunity to ask questions.

1          MR. MONROE:  All right.

2          THE COURT:  Typically, it would be either/or.  I'm

3   not particularly wedded to jury questionnaires, but if you all

4   can come up with something mutually agreeable, I'll consider

5   it.

6          MR. MONROE:  Well, I smiled, Your Honor, because I

7   recall I think another time that I imposed on you to do a

8   questionnaire and afterwards you expressed regret.  That was a

9   -- it was a tax case.  But --

10         THE COURT:  Which case was that?

11         MR. MONROE:  It was Howard Mitchell and Edna.

12         THE COURT:  Oh, yes.

13         MR. MONROE:  Skip Durbin and I tried that.

14         THE COURT:  Oh, yes.  I think the jury --

15         MR. MONROE:  It was hung.

16         THE COURT:  -- came up -- well, I think they came up

17   with the right decision.

18         MR. MONROE:  Oh, yes, yes.  Certainly with respect

19   to Mrs. Mitchell.

20         THE COURT:  Yes.

21         MR. MONROE:  And, you know, we worked it out.  We

22   didn't have to retry the case on Mr. Mitchell.  But that was a

23   case -- and anytime the Internal Revenue Service is bringing a

24   prosecution, there's going to be somebody that may have an

25   opinion, strong opinion, that they may not express in open

 1    court as freely as they would on an answer to a questionnaire.

 2            But back to the point, I would like an opportunity to

 3    sit down with government counsel, see if we can come up with

 4    something's that's acceptable to both sides to submit to Your

 5    Honor for consideration.

 6            And my concern is the publicity.  It's the fifth trial,

 7    you know.  I purposely didn't -- I didn't -- in my attachment

 8    to the motion for continuance, I didn't intend for you to have

 9    to go digging through all the news articles that were linked

10    because that would have just been a nightmare to read all that.

11    I think the point I was trying to make is, there's a lot.

12    That's the point.

13            And so if we can do that and submit something to you by

14    mid week, would that be acceptable?

15            THE COURT:  That would be fine.  Mr. Lenhardt, what

16    are your thoughts here?

17            MR. LENHARDT:  I concur.

18            THE COURT:  Very good.  Thank you.

19            Now, in terms of voir dire, what's the government's

20    position?

21            MR. LENHARDT:  I think what you've set forth is

22    fine, Judge.  You said you're not going to allow us too many

23    questions.  We'll submit a couple for your consideration and

24    then we'll see how it goes from there.

25            THE COURT:  All right.  But I gave you alternatives

1    as to what I've allowed in the past.  Like most federal judges,

2    I came from state court where it was anything goes and

3    sometimes it was really excessive in terms of attorney voir

4    dire.  And so I've become more restrictive after 14 years of

5    this over in federal court, at least believing -- perhaps

6    wrongly -- but believing that court voir dire can ensure a fair

7    jury for both sides.  I am persuaded, though, and I think the

8    Tenth Circuit case law suggests that allowing attorney voir

9    dire in a criminal case is helpful and the court can set

10   reasonable limits.

11        So my question to you then is, would you prefer that,

12   to have a limited time to ask questions; or in the alternative,

13   suggest to the court voir dire questions and have the court ask

14   them, and then give you an opportunity at the end of the

15   court's voir dire to point out questions that I did not ask and

16   plead with me to ask them?

17        **MR. LENHARDT:**  I've done all the above in the past,

18   Judge.  I honestly don't have a preference.

19        **THE COURT:**  Okay.  And so I take it, Mr. Monroe,

20   you'd prefer to have the opportunity to ask questions; correct?

21        **MR. MONROE:**  Yes.  I would like that briefly,

22   fifteen minutes or so, just more or less to introduce ourselves

23   to the jury.

24        But back on the questionnaire, I do note that today's

25   our deadline for filing proposed voir dire questions.

1          THE COURT:  Uh-huh.

2          MR. MONROE:  And I'd actually worked on that

3    somewhat over the weekend.  But if there's going to be a

4    questionnaire, I can take a whole lot of that stuff out and

5    just ask you to submit proposed questions on some subjects that

6    are not going to be included in the jury questionnaire.

7          So, again, if we can get together, come up with what we

8    would submit as a joint questionnaire that it's acceptable to

9    you, then that could be given to the jurors before the actual

10   voir dire begins and it should shorten it.

11         THE COURT:  We're going to have some difficulty in

12   timing because some of the panel will not come to us until

13   after Judge Eagan has released those individuals from jury

14   selection in the case that she's trying.

15         MR. MONROE:  I see.

16         THE COURT:  So there won't be very much time for

17   them to complete a jury questionnaire, and I would prefer to be

18   able to get started at 1:30, if at all possible.

19         MR. MONROE:  Sure.

20         THE COURT:  So keep it short.

21         MR. MONROE:  Okay.  Focused mainly on the publicity

22   aspects is what I would like.

23         THE COURT:  Then, of course, we have to make

24   copies --

25         MR. MONROE:  Right.

1    THE COURT:  -- of all of those responses, which

2    takes time and I found that it really bogs down the process.

3    Then you all want the opportunity to review them all.  And so

4    we're going to have about 50 people and that's going to take

5    time.  So --

6    MR. MONROE:  Your Honor, I understand your

7    frustration.  I know it's cumbersome.  But I think this case is

8    one -- because of the circumstances -- is one that a very

9    limited questionnaire will actually expedite the process.

10    I mean, the worst part from our perspective is you

11    start asking in open court questions about, what have you seen,

12    what have you heard, what have you read, and the more responses

13    we get from jurors is potentially going to contaminate the

14    panel.  So if we can just focus the questionnaire primarily on

15    the publicity aspect, then we won't have to actually spend much

16    time speaking about that during the voir dire of the panel.

17    *(Discussion held off the record)*

18    THE COURT:  Well, I foresee some problems.  The jury

19    clerk is having some additional prospective jurors come in at

20    noon, and if we require them to fill out a questionnaire,

21    you're likely to have some jurors who will not have had the

22    opportunity to eat lunch, going to be cranky.  So keep it

23    short, all right, because they need to be in my courtroom at

24    1:30.

25    I'm not going to give you much, if any, time to review

1   those questionnaires because you will be most interested in

2   those jurors who are called to the box.  And so you can pull

3   out those questionnaires as we're going through them so they'll

4   be available to you, but you're not going to have an evening to

5   review the questionnaires and have some, you know, assistant

6   going through all 50 of them to determine your priority of

7   selection.  So it's going to be a quick process.

8           **MR. MONROE:**  We understand.  We appreciate it.  We

9   think this is a real critical part of the jury selection.

10          **THE COURT:**  All right.

11          **MR. MONROE:**  So --

12          **THE COURT:**  What else?

13          **MR. LENHARDT:**  Just one final recommendation from

14  the government, Your Honor --

15          **THE COURT:**  Yes, sir.

16          **MR. LENHARDT:**  -- and I won't have anything else.

17          When you have cases that have some amount of publicity

18  to them, what we often see on behalf of the government is

19  motions from the defense for either a change of venue or a

20  change of veneer.  I know that hasn't happened in this

21  particular case.  The government is not asking for those

22  things.  However, I just want to make sure that the defendant

23  himself doesn't want a change of venue or venire.  I think we

24  can sort of avoid potential problems down the road if we just

25  ask that question now.

1      THE COURT:  All right.  That's fine.  Well, it would

2   be a little late.  Mr. Monroe.

3      MR. MONROE:  Your Honor, I have been practicing a

4   number of years, as Your Honor knows.  I've had occasion,

5   mostly in state court proceedings, to file motions for change

6   of venue.  My experience and then observations of others'

7   experience in state and federal court, the typical response is

8   that the court will conduct voir dire to determine whether or

9   not we can even select an impartial jury.

10      Now, the *Timothy McVay* case is the one that comes to

11   mind.  That was taking place in the Western District in

12   Oklahoma City which was where that bombing took place.  It

13   affected a whole lot of citizens in that community, and I can

14   see how the court had no choice but to grant a change-of-venue

15   motion.

16      But as I said, my experience has always been judges

17   like to take the opportunity to see if there can be an

18   impartial jury without a request.

19      THE COURT:  Right.

20      MR. MONROE:  And so that was the reason that I asked

21   for the questionnaire.  I just didn't think a change of venue

22   would be necessary since the Northern District encompasses more

23   than just the city of Tulsa.

24      THE COURT:  I think that's right.  I do have some

25   questions here because you are much more familiar with the

1  facts than I, but I have a few questions, just background

2  questions, here.

3        Mr. Harper swabbed the gun and apparently at or about

4  the time the guilty plea was found.  Was that swab the swab

5  that was used to test for DNA?  Apparently, Harper didn't

6  request that the gun be tested for DNA at that time.  But why

7  did he swab it?

8        **MR. LENHARDT:**  So we have to -- I have to understand

9  which gun you're talking about because there was --

10       **THE COURT:**  The trash-can gun.

11       **MR. LENHARDT:**  Okay.  I just wanted to make sure

12  which one you were talking about.

13       **THE COURT:**  Yes, sir.

14       **MR. LENHARDT:**  There was DNA testing done on that

15  swab and essentially there was nothing of value, I think is the

16  short version.

17       **THE COURT:**  All right.  So I was unclear as to

18  whether or not that swab was the swab used to test for DNA.

19       **MR. LENHARDT:**  I hadn't anticipated this question so

20  I didn't dig into it, but from everything I know at the moment

21  that is my understanding, Your Honor.

22       **THE COURT:**  All right.  With respect to issues that

23  may be raised at trial, Mr. O'Carroll frequently characterized

24  Mr. Lake as a "sexual predator."  We note that during the

25  fourth trial, Judge Holmes precluded the defense counsel for

1    the first time in the series of trials from referring to

2    Mr. Lake as a sexual predator, and part of her statement on the

3    record was that the sexual offenses didn't have anything to do

4    with whether Jeremy had a gun or that Jeremey was coming at

5    him with a gun so she wasn't going to let Mr. O'Carroll go

6    there.

7         I take it there's not going to be any sexual predator

8    issues here?  Or I guess then the question is, what did the

9    defendant learn from his review of Mr. Lake's history that was

10   available to him as an officer?

11        MR. LENHARDT:  Your Honor, from the beginning of my

12   involvement in this particular case, the one thing that I

13   wanted to do was to make sure that the defense was aware of

14   everything that I could find out.  This was not a "play the

15   game as close to the vest as you can"; this was "be as open as

16   you humanly can."  That was even before we ultimately

17   determined that we should seek indictment and the Grand Jury

18   indicted him.

19        So among the things that I did is actually try to

20   determine exactly what the defendant could learn about Jeremey

21   Lake to find out what is accurate and what is inaccurate.  So I

22   had the folks at the Tulsa Police Department see exactly what

23   was available and what would have been available to the

24   defendant.  I then put that person in the Grand Jury and I

25   turned that information over to the defense.  So every police

1    report that's ever been generated as a result of Jeremey Lake

2    was turned over to the defense.

3          To call him a sexual predator in my mind was wholly

4    inaccurate.  There was absolutely no indication in any of those

5    reports that he had sexually molested anyone else.  There was

6    indications that he, himself, had been sexually molested.  So

7    calling him a sexual predator was wholly inaccurate in my

8    opinion.

9          THE COURT:  So these reports indicated that Lake had

10   been sexually molested?

11         MR. LENHARDT:  Yes, sir.  But not that he, himself,

12   was a person who had committed any of those types of acts.  So

13   every one of those police reports that I found I turned over to

14   the defense, and I intend to put them into evidence at this

15   trial so that there is no dispute about what the allegations

16   against Mr. Lake were.

17         THE COURT:  Okay.  Just so I understand, though,

18   there were no previous charges of sexual predation?

19         MR. LENHARDT:  Correct.

20         THE COURT:  All right.  There were accusations of

21   assault and battery; correct?

22         MR. LENHARDT:  There was one report when Jeremey

23   Lake was approximately 16 years old.  As indicated by both

24   sides, both at the previous trial and here in federal court,

25   Jeremey Lake was often raised by the system rather than by his

1    family.  When Jeremey Lake was 16 years old, he was in a

2    juvenile facility, not because he had committed any crime, but

3    because he didn't have anyone to watch over him.  On his

4    16th birthday, his family was supposed to come and pick him up.

5    They failed to show.  It's not that they called and said they

6    couldn't make it; they failed to show.

7         Shortly thereafter, Jeremey Lake approached one of the

8    people who worked at the facility, pushed him, and said that he

9    wanted to punch him in the face.  For that, Jeremey Lake was,

10   in fact, arrested and those charges were ultimately -- he was

11   not adjudicated delinquent of those charges.

12        THE COURT:  So it wasn't pursued or he was found not

13   guilty of juvenile delinquency?

14        MR. LENHARDT:  I'm not trying to give you any false

15   information.  I believe that there was some sort of alternative

16   resolution, sort of a pretrial diverse-type resolution, but I

17   can't remember off the top of my head, Judge.

18        THE COURT:  All right.  What's this about

19   photographs of knives on his Facebook page?  Is that going to

20   be an issue here?

21        MR. LENHARDT:  So there were a photograph of a knife

22   on his Facebook page.  That is one of the things that the

23   defendant could have accessed before he went to the scene.  So

24   it does appear from the government's perspective that the

25   defense would be able to provide that in so I expect that it

1   will come in, Judge, and there will be no argument from the

2   government that it should not be.

3            THE COURT:  All right.  Apparently, Mr. Kepler

4   obtained information from DHS records after the shooting.  I

5   take it those will not come in?

6            MR. LENHARDT:  Defense counsel in the state charges,

7   Your Honor, had asked the court to issue an order allowing him

8   to access some of those things.  I know that that was done.  I

9   have no intention of bringing any of that out.

10           THE COURT:  All right.  Mr. Monroe, I mean, items

11  found from the DHS records after the shooting surely are not

12  pertinent here; correct?

13           MR. MONROE:  Well, I'm not specifically aware of the

14  reference you're making.  With respect to Mr. Kepler's search

15  of records while he was on duty earlier in the day and then

16  after he got home, those are certainly germane to what prompted

17  him to go to the scene in the first place.

18           THE COURT:  Right.  And the government, if I

19  understand correctly, says it's all coming in?

20           MR. MONROE:  Well, but I wanted to revisit one

21  aspect of Mr. Lenhardt's comments.

22           THE COURT:  All right.

23           MR. MONROE:  Mr. Lake was investigated for an

24  alleged sexual offense against his younger brother, Michael.

25  That's what I think prompted the defense to refer to Mr. Lake

1    as a sexual predator.  I've thought about this issue a lot and

2    I don't plan to go there.  I don't plan to go there, but I

3    certainly plan to bring up the fact that Mr. Kepler had been --

4    and "charge" is really not the appropriate word in the juvenile

5    proceeding -- but had been named in a petition by the juvenile

6    authorities with respect to this assault and battery on an

7    employee of the -- I believe it was Shadow Mountain -- and that

8    would tend to show potential acts of violence.  And then, of

9    course, you know, Mr. Lake carried that -- all the parties

10   agree Mr. Lake carried that knife with him just about

11   everywhere he went so that will be coming in.

12          But the sexual predator aspect, it's not -- it can't be

13   dismissed quite as easily as the government suggests because

14   there was a -- I don't want to say "charge" -- but there was an

15   investigation into whether or not there was some inappropriate

16   behavior toward his younger brother, Michael.

17          **THE COURT:**  And that was valuable on NCIC to

18   Mr. Kepler before the shooting?

19          **MR. MONROE:**  There's something called JOLTS,

20   J-O-L-T-S, and it's Juvenile Offender, something else,

21   something else.  And if I had known Your Honor was going to be

22   inquiring, I would have brought that part of my file with me.

23   But I think the government will concede that on that JOLTS

24   record, there is a reference to this incident between Mr. Lake

25   and his younger brother at some point a couple years before the

1    incident.

2         So sexual predator, no.  But with respect to a

3    concerned father who's wanting to rescue his daughter from a

4    potentially dangerous situation, if Mr. Kepler testifies, I

5    would think it might be appropriate for him to say, well, I saw

6    something that gave me something else besides the violence that

7    gave me some concerns.

8         THE COURT:  Okay.  So the two things, as I

9    understand it, are the A & B on the DHS or Shadow Mountain

10   worker.

11        MR. MONROE:  Yes.

12        THE COURT:  And the other is some reference to a

13   JOLTS record regarding an investigation of "lewd mol" of his

14   younger brother.

15        MR. MONROE:  I don't remember if it's "lewd mol" --

16   I don't remember the exact particulars but it was of a sexual

17   nature, yes, Your Honor.

18        THE COURT:  All right.  Is that the government's

19   understanding?

20        MR. LENHARDT:  Whatever records are admissible will

21   be put into evidence, Your Honor.  So there's no dispute by

22   both sides that those can be admissible so I don't think

23   there's going to be a fight about that.

24        The only thing that you're referencing is, can either

25   side call him a "sexual predator," and it sounds like that's

1    not going to happen so I think this whole sort of whole issue

2    is moot.

3         THE COURT:   Well, I was trying to get a concept of

4    what you all agree on as to what was available to Mr. Kepler;

5    in other words, what he had in his head as he was driving and

6    arrived at the scene.   So there's no question he had access to

7    the JOLTS report and he had access to a report of aggravated

8    assault and battery of this DHS or Shadow Mountain worker.

9         MR. LENHARDT:   Whatever he had access to will come

10   into court and there will be no objection from the government,

11   Your Honor.

12        THE COURT:   Okay.   Thank you so much.

13        All right.   Will there be any attempted admission of

14   evidence as to Lisa Kepler's character, 404(a)?

15        MR. MONROE:   I mean, is Your Honor asking about

16   criminal charges with her or --

17        THE COURT:   Well, I was more interested in character

18   evidence.   In the state court trial, as defense counsel argued,

19   Lisa Kepler had been "going out at 2:00 or 3:00 in the morning

20   and doing sex acts for drugs."   There were motions filed before

21   the fourth trial with respect to a June 28, 2017, arrest of

22   Lisa Kepler by the Mannford Police Department for misdemeanor

23   possession of marijuana and possession of drug paraphernalia.

24   In any event --

25        MR. MONROE:   Well, that last subject about her

1   arrest, I don't plan to open that up.  I think it would have

2   been relevant in the state court proceeding because it happened

3   right around the time the trials were going on, and then the

4   question was, well, you know, was she under the influence at

5   the time she testified?  But, no, I don't plan to -- I don't

6   plan to get into her arrest in Mannford.

7           I do think there's got to be some testimony -- and

8   probably Lisa Kepler will provide it -- that she was

9   misbehaving, I mean, off-the-charts kind of misbehaving,

10  sneaking out, bringing boys into the home in the middle of the

11  night, that sort of thing, which is what prompted her parents

12  to take her to the shelter and here we are.  So I think some of

13  that evidence has to come in.  But, again, based on

14  Ms. Kepler's testimony at the bond hearing, and I'm sure even

15  in her Grand Jury testimony that the government's provided me,

16  some of that evidence is there and she'll certainly testify

17  about those things.

18          **THE COURT:**  All right.  My understanding -- and,

19  frankly, I had enough to do here -- I wasn't on top of every

20  fact reported in the paper on those four trials.

21          **MR. MONROE:**  Of course, sure.

22          **THE COURT:**  But it was reported to me, perhaps

23  inaccurately, that Lisa Kepler's testimony has varied over the

24  trials.

25          **MR. MONROE:**  It has.  There have been some minor and

1   some not so minor inconsistencies.  But I think she will be the

2   first to admit that she was using a lot of drugs, both around

3   the time of the subject incident and while those state trials

4   were going on.  She's, at least for the most part, overcome a

5   lot of those challenges, had been in a sober-living situation

6   here recently, and is doing much better in terms of those

7   behaviors that were concerning to her parents back in 2014.

8               **THE COURT:**  How old is she now?

9               **MR. MONROE:**  She's 21 now?  24.  Okay.  Sorry.  24,

10  24.

11              **THE COURT:**  And has children of her own?

12              **MR. MONROE:**  Yes.  She has a child, yes.

13              **THE COURT:**  All right.  Anything for the record?

14              **MR. LENHARDT:**  I don't think it's necessary, Your

15  Honor.  Mr. Monroe and I have already discussed what we believe

16  should be admissible, and so I don't think there's going to be

17  any fights in that regard.

18              *(Discussion held off the record)*

19              **THE COURT:**  Just trying to make sure we've covered

20  everything.  The defendant filed a motion to produce

21  exculpatory evidence under *Brady* and *Giglio* at docket No. 51.

22  Typically, the magistrate judges have been entering orders at

23  the outset of these cases requiring production of *Brady*.  Was

24  that done here?

25              **MR. MONROE:**  I don't have a specific memory of that,

1    Your Honor.  I do know that we had -- we had a detention

2    hearing and I -- I just don't have a recollection.  I mean, I

3    know they do it routinely.  In just about every case I've had

4    this calendar year, the magistrates have entered the order.  I

5    didn't look on the docket to see if it was done here.

6             THE COURT:  I was just told it was done at docket

7    61.  So to the extent that the defendant's asking for *Brady*

8    material, the motion's moot given the order at docket No. 61.

9             MR. MONROE:  All right, sir.

10            THE COURT:  And to the extent that we've addressed

11   *Giglio*, obviously that remains a continuing obligation.  We've

12   addressed two potential witnesses here.  But to the extent that

13   the defendant seeks impeachment material, of course, that

14   motion's granted.

15            Anything further?

16            MR. LENHARDT:  No, sir.

17            MR. MONROE:  Nothing from the defendant, no, Your

18   Honor.

19            THE COURT:  All right.  Thank you all very much.

20            MR. MONROE:  Thank you.

21            THE COURT:  We are in recess.

22               *(The proceedings were concluded)*

23

24

25

*C E R T I F I C A T E*

1

2

3

4          I, Brian P. Neil, a Certified Court Reporter for the

5    Northern District of Oklahoma, do hereby certify that the

6    foregoing is a true and accurate transcription of my

7    stenographic notes and is a true record of the proceedings held

8    in above-captioned case.

9

10          I further certify that I am not employed by or related

11    to any party to this action by blood or marriage and that I am

12    in no way interested in the outcome of this matter.

13

14          In witness whereof, I have hereunto set my hand this

15    29th day of May 2021.

16

17

                         s/ Brian P. Neil
18                 _____

19                      *Brian P. Neil, RMR-CRR*
                        *United States Court Reporter*

20

21

22

23

24

25